IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:24-cv-00584-FL

| | | |
|---|---|---|
| G. TYSON HOPKINS ASSOC LLC d/b/a TOPSAIL ISLAND MARINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| COMMERCE AND INDUSTRY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

This matter is before the court upon the parties' cross-motions for summary judgment. (DE 21, DE 25). The motions have been briefed fully and, in this posture, the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted, and plaintiff's motion is denied.

## STATEMENT OF THE CASE

Plaintiff commenced this action in the Superior Court of Pender County, May 22, 2024. Defendant removed this case to the Eastern District of North Carolina, July 12, 2024. Plaintiff asserts claims for breach of contract, unfair claim settlement practices and unfair trade practices, and breach of the covenant of good faith, in connection with a denial of insurance coverage. Plaintiff seeks treble and compensatory damages, punitive damages, and attorneys' fees. Discovery ended March 28, 2025.

In support of its motion, defendant relies on the insurance policy between the parties ("the Policy"), a lease agreement between plaintiff and its tenant, discovery responses, an order from the North Carolina Department of Environmental Quality, and coverage determination letters and the correspondence regarding them. In support of its motion, plaintiff relies on affidavits from its

members, plaintiff's insurance agent, and an employee of a contractor involved in this matter. Plaintiff also relies on the Policy, the coverage determination letters, communications between plaintiff's counsel and defendant, and invoices billed to plaintiff.

## STATEMENT OF FACTS

Plaintiff is a small business based in Virginia. (Gerard Hopkins Aff. (DE 27) ¶ 1). Plaintiff owns Topsail Island Marina ("the marina"), located in Surf City, North Carolina. (Id. ¶ 2). In May 2018, plaintiff leased the premises to Aquaholics Boat Rentals, LLC. (DE 24-1 at 1).

In relevant part, the lease agreement provides: "Tenant is responsible for clean up, fines, and any environmental restitution necessary that proceeds from any spill related to Tenant's actions. In case of spill of petroleum products, Tenant shall bear responsibility and hold Landlord harmless." (Id. at 2). It also provides that "Tenant will, at its own expense, make all repairs and replacements necessary, including capital repairs and replacements necessary, including capital repairs and replacements [sic], keep the leased premises and the fuel dock and fuel distribution tank and system and all other equipment thereof in good repair and in proper working condition in compliance with all governmental and environmental codes and requirements." (Id. at 4-5).

The lease also states: "Tenant agrees that it will indemnify and save Landlord harmless from any and all liability, damage, expenses, and costs, cause of action, suits, claims or judgments arising from injury to person or property on the demised premises." (Id. at 5). Regarding environmental damage: "All property in said premises shall be and remain at Tenant's sole risk. Landlord shall not be liable for any damage or loss arising from the bursting, overflowing or leaking of the fuel tanks, pumps, pipes, or system." (Id. at 7).

Plaintiff, the insured, entered into the Policy with defendant, the insurer, May 9, 2021. (DE 24-5 at 1). The policy provides that: "Subject to the applicable limits of liability and the deductible,

2

[defendant] agrees to pay on behalf of the Insured reasonable and necessary costs that the Insured is legally obligated to pay for Cleanup of Pollution Conditions from an Aboveground Storage Tank, as a result of a Governmental Order." (DE 24-5 at 3) (emphasis removed). "[B]oth the Governmental Order must first issue against the Named Insured and the Claim reporting the Governmental Order must be first reported to the Company, in writing." (Id.) (emphasis removed). A "claim" is defined as "a notice to the Company written by or on behalf of the Named Insured reporting receipt of a Governmental Order which was first issued against the Named Insured during the Policy Period or Extended Reporting Period, if applicable." (Id. at 6) (emphasis removed). A "governmental order" is defined as "an order, including any governmental directive, lawfully issued against the Insured by an Implementing Agency or other governmental agency or court." (Id. at 7) (emphasis removed).

The Policy is a "claims-made and reported policy." (Id. at 3). Under the policy, "[i]n the event the Insured is issued a Governmental Order requiring Cleanup, the Insured must submit a Claim under Coverage C, in writing, as soon as possible but in any event no later than seven (7) days after receipt of the Governmental Order." (Id. at 4) (emphasis removed).

The Policy also has a provision that "[I]n the event that the Insured and the Company dispute the meaning, interpretation or operation of any term, condition, definition or provision of this Policy resulting in litigation, arbitration or other form of dispute resolution, the Insured and the Company agree that the law of the State of New York shall apply [.]" (Id. at 14) (emphasis removed).

"On or about October 20, 2021, an accidental release or discharge of petroleum from an above-ground storage tank occurred at the Marina (the "Incident")." (Gerard Hopkins Aff. (DE 27) ¶ 4). Plaintiff learned of the release approximately 24 hours later, when Alex Schroeder

("Schroeder") of A and J Fuel Dock, LLC ("A&J") informed it. (Id.). "Schroeder informed [Gerard Hopkins] that a fuel release had happened, that the North Carolina Department of Environmental Quality ("NCDEQ") and the Coast Guard had been informed, and that NCDEQ and Highlands Environmental Solutions ("HES") were evaluating the extent of the problem, and that HES had been contracted to evaluate and clean up the release." (Id.).

"Within 24 hours of this first notice that Plaintiff received of the Incident, (1) [Gerard Hopkins] contacted Joe Beaman of HES who provided his preliminary evaluation of the Incident and who explained how the cleanup would be accomplished, and (2) [Gerard Hopkins] contacted the insurance agent for the Policy, Don Sayer [("Sayer")], to provide notice of the Incident." (Id.). Sayer acted as the insurance broker for plaintiff and procured the Policy from defendant, but Sayer is not employed or affiliated with defendant. (See Sayer Aff. (DE 38) ¶¶ 1-3).

On October 26, 2021, the NCDEQ wrote a "notice of regulatory requirements" directed to A&J and Schroeder, which states, in relevant part, the NCDEQ "confirm[ed] a release or discharge of petroleum at the [Marina]. Furthermore, this office has determined that you are the responsible party for the assessment and cleanup of the release or discharge." (DE 24-6 at 1). "As the responsible party, you must comply with the initial response and abatement action . . . within the timeframes specified in the attached rules." (Id.). The NCDEQ's letter copied "William Hopkins, G. Tyson Hopkins Associates, LLC." (Id. at 2).

On December 8, 2021, Kendall Sutler ("Sutler"), a senior project manager with HES, emailed Sayer to provide an update on HES's activities at the Marina. (DE 24-7 at 3). Suttler's email attached a form which listed "A and J Fuel Dock, LLC Attn: Alex Schroder" as the "party responsible for release," and listed plaintiff as the landowner of the Marina. (24-8 at 2).

4

Plaintiff reported the claim to defendant December 13, 2021, and an agent for defendant acknowledged receipt the next day. (DE 24-7 at 1, 6). Sutler provided defendant with an invoice for work on the site, which stated "BILL TO Mr. Alex Schroeder A and J Fuel Dock, LLC." (DE 24-10 at 1-3).

On January 26, 2022, defendant provided plaintiff with coverage determination. (DE 24-12). Defendant stated the "NCDEQ Notice was issued to A and J and directed A and J to comply with the initial response and abatement action, hydrostatic testing, and, if applicable, the assessment and reporting requirements. This Notice was not issued against the Insured, nor did it obligate the Insured to pay for any cleanup costs. As such, there is no coverage available under Coverage C." (Id. at 6). "[T]he aforementioned cleanup costs are precluded by this Policy, as the Insured has not been directed by a Governmental Order to do so." (Id. at 8).

The letter concluded by stating "[defendant's] position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by defendant or any of its affiliates. CIIC expressly reserves all of its rights under the Policy, including the right to assert additional defenses to any claims for coverage." (Id. at 8).

On February 23, 2022, defendant began to reconsider its coverage determination. (DE 24-13 at 5). After this, defendant issued a supplemental coverage determination, April 6, 2022, affirming its decision to deny coverage. (DE 24-14). Defendant maintained "[p]ursuant to the NCDEQ Notice, the Insured was not obligated to perform cleanup at the [Marina]." (Id. at 8). Defendant also stated an additional grounds for denial, that "[t]o the extent that there was a claim made that obligated the insured to perform such actions, the Policy's notice provisions require the

claim to be submitted no later than seven (7) days after receipt of the Governmental Order. The Insured reported this loss to defendant on December 13, 2021." (Id. at 6).

The NCDEQ issued another notice of regulatory requirements to A&J and Shroeder on May 6, 2022, also stating "[t]his office has determined that you are responsible for the release or discharge." (DE 27-10 at 29).

On May 5, 2022, plaintiff sent defendant invoices from HES which now listed "G. Tyson Hopkins Assoc., LLC" as the billed party. (DE 24-15 at 4-7). Defendant reiterated its previous denials of coverage on May 13, 2022. (Id. at 1). Plaintiff also filed a complaint with the North Carolina Department of Insurance, after which defendant reviewed and reaffirmed its coverage determination. (DE 24-16).

Plaintiff's counsel then sent a letter June 5, 2023, asking defendant to reconsider its denial of the claim. (DE 27-5 at 1-6). Defendant responded June 28, 2023, stating, in relevant part: "Your June 5 letter indicates that the NCDEQ ordered [plaintiff] to assess and clean up the site. However, to date we have only been provided with the NCDEQ letter issued to A & J Fuel Dock, LLC. Has there been any correspondence from NCDEQ to Hopkins about the site? If so, could you please send us copies?" (DE 27-6 at 1).

On July 10, 2023, plaintiff provided defendant with copies of HES documents and invoices paid by plaintiff. (DE 27-9 at 2-4). Plaintiff's counsel then followed up with defendant after not receiving a response on July 26, 2023. (DE 27-7). Plaintiff's counsel also sent defendant a letter via overnight mail September 1, 2023, requesting an update. (DE 27-8).

Defendant responded November 9, 2023, asking for correspondence from the NCDEQ to plaintiff directly. (DE 27-9 at 1). In response, plaintiff provided additional HES invoices and the NCDEQ's notices directed to Schroeder and A&J, stating "[t]he addressee was a mistake by

NCDEQ as Aquaholics was just one of the tenants at the marina and they were not the operator of the fuel dock." (DE 27-10 at 18).

After not receiving a response, plaintiff followed up with defendant on December 2, 2023. (DE 27-11 at 1). Defendant did not respond to these inquiries, and plaintiff then filed suit May 22, 2024. (Gerard Hopkins Aff. (DE 27) ¶ 19).

## COURT'S DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[1]

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

---

[1]     Throughout this order, internal quotation marks and citations are omitted unless otherwise specified.

for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

    1.    Breach of Contract

Plaintiff argues defendant improperly denied coverage, and therefore it is entitled to recover for breach of contract. Defendant argues there is no genuine issue of fact that plaintiff failed to comply with the notice requirements in the Policy, thus defeating plaintiff's breach of contract claim. Where the court agrees with defendant, the court necessarily does not reach defendant's additional argument for summary judgment on plaintiff's breach of contract claim.

8

Under North Carolina law,[2] "[w]here the terms of [a] contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). "The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policyholder, or the beneficiary, and against the company." Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354 (1970). "However, ambiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning." Id. "No ambiguity, calling the above rule of construction into play, exists unless, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Id.

"[T]he court must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Id.

The notice provision within the contract explicitly states: "[i]n the event the Insured is issued a Governmental Order requiring Cleanup, the Insured must submit a Claim under Coverage C, in writing, as soon as possible but in any event no later than seven (7) days after receipt of the

---

[2]     The parties dispute whether North Carolina or New York law applies to this insurance contract. At the same time, the parties acknowledge the insurance law of either state does not materially differ. "Choice of law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes and where the laws do not so conflict, the choice is immaterial, and the law of the forum [] governs. Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 101 (4th Cir. 2013). Here, there is a "close connection" with the insurance contract and North Carolina. The contract explicitly states the "covered location" is in North Carolina. (DE 24-5 at 19). Accordingly, North Carolina law applies to the insurance contract. See N.C. Gen. Stat. § 58-3-1; Cordell v. Bhd. of Locomotive Firemen & Enginemen, 208 N.C. 632 (1935); Collins & Aikman Corp. v. Hartford Acc. & Indem. Co., 335 N.C. 91 (1993). In any event, because the outcome does not differ if North Carolina or New York law applies, the court applies North Carolina law.

Governmental Order." (DE 24-5 at 4) (emphasis removed). There is no ambiguity that under the contract terms plaintiff must report a claim within seven days after receipt of a governmental order.

It also is undisputed plaintiff did not report the claim within seven days. (DE 24-7 at 1). The NCDEQ sent its first order on October 26, 2021. (DE 24-6). While plaintiff reported the claim to Sayer, plaintiff's insurance agent, within 24 hours of the Incident, Sayer did not report the claim to defendant until December 13, 2021. (Gerard Hopkins Aff. (DE 27) ¶ 4, DE 24-7). The Policy also explicitly states compliance with the notice provision is a condition precedent to coverage. (DE 24-5 at 13). Because plaintiff did not comply with this condition precedent for coverage, defendant is therefore entitled to summary judgment on plaintiff's breach of contract claim. See, e.g., Farmers Bank, Pilot Mountain v. Michael T. Brown Distributors, Inc., 307 N.C. 342, 348 n.1 (1983) ("A condition precedent is a fact or event occurring subsequently to the making of a valid contract, that must exist or occur . . . before the usual judicial remedies are available.")

Plaintiff argues, based on the tests enunciated in Great Am. Ins. Co. v. C. G. Tate Const. Co., 303 N.C. 387, (1981) ("Great American I") and Great Am. Ins. Co. v. C.G. Tate Const. Co., 315 N.C. 714 (1986) ("Great American II"), defendant must show prejudice before denying coverage on the basis of untimely notice.

 "Put succinctly, the 'Great American test' is as follows: (1) whether there was a delay in notifying the insurer of a covered loss (the "Notice Element"); (2) if such notice was delayed, whether the insured acted in good faith with respect to the delay (the "Good Faith Element"); and (3) if the insured acted in good faith, whether the insurer was nevertheless materially prejudiced by the delay (the "Prejudice Element")." Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197–98 (4th Cir. 2005).

10

However, the Great American test does not apply to this case. In Great American, the policies only stated a claim must be made "as soon as practicable." Great American II, 315 N.C. at 744. The policies did not provide a clear notice requirement within a set number of days, as here. See id.

"[I]f the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written." Dawes v. Nash Cnty., 357 N.C. 442, 449 (2003). The Great American test, and subsequent case law, do not instruct the court to override unambiguous contractual provisions. Rather, the Great American cases focused on the "reasonable expectations of the parties" when notice was required as soon as practicable. See Great American I, 303 N.C. at 396; see, e.g., John Hiester Chrylser Jeep, LLC v. Greenwich Ins. Co., No. 5:17-CV-00140-FL, 2017 WL 6210897, at *3 (E.D.N.C. Dec. 8, 2017) (noting "[t]he policy at issue in the Great American decisions, however, was not a claims made and reported policy, meaning the policy did not require the claim or notice to occur during the policy period, instead it only required that notice be given 'as soon as practicable'" and "[u]nlike the policy at issue in the Great American decisions, the policies presently before the court are clear and unambiguous.").

Plaintiff argues the "ambiguity created by defendant in the Policy as to when a verbal directive by an implementing agency is made must be construed against it." (Pl's Br. Opp. (DE 35) at 10 n.5). However, there is no ambiguity in the notice provision. The Policy states a claim must be made "as soon as possible but in any event no later than seven (7) days after receipt of the Governmental Order." (DE 24-5 at 4). Whether a governmental order could be verbal or written, a claim must still be made within seven days of receipt. This does not create sufficient ambiguity to justify applying the Great American test. See Crockett, 289 N.C. at 631; Wachovia Bank &

Trust Co., 276 N.C. at 354. In sum, because there is a clear contractual notice term, defendant need not show prejudice.[3]

Plaintiff also argues that because defendant's first denial did not mention the notice provision, defendant waived any subsequent reliance on it. In particular, plaintiff contends "[i]n North Carolina, an insurer is compelled to be consistent in their denial or reservation of rights communications to an insured and that consistency is lacking here." (Pl's Br. (DE 29) at 12). Plaintiff bases this assertion on DENC, LLC v. Philadelphia Indemnity Ins. Co., 32 F.4th 38 (4th Cir. 2022).

However, DENC is inapposite. There, the "[defendant] advised [plaintiff] that it would be investigating the claim under a reservation of rights. Two days later, [defendant] stated that it had 'issued, or [would] be issuing payment' to [plaintiff]. Yet a few weeks after that, [defendant] denied [plaintiff's] claim in a letter that failed to reference its earlier agreement to pay." Id. at 50. The subsequent denial "letter [did not] explain which of the many enumerated provisions barred coverage." Id. at 51. The United States Court of Appeals for the Fourth Circuit therefore found the defendant "offered no reasonable explanation for denying coverage, which [N.C. Gen. Stat.] § 58-63-15(11)(n) requires." Id.

The facts and denials at issue in the instant case do not resemble DENC. Here, defendant issued an initial denial based on the failure to show a governmental order directed at plaintiff. (DE

---

[3]     New York law is similar. The New York common law rule did not require an insurer to show prejudice before denying coverage. Sec. Mut. Ins. Co. of New York v. Acker-Fitzsimons Corp., 31 N.Y.2d 436, 440, (1972) ("[T]he insurer need not show prejudice before it can assert the defense of noncompliance."). Subsequently, New York enacted a statute requiring a showing of prejudice in some circumstances for policies "issued or delivered in this state." N.Y. Ins. Law § 3420. However, for policies not issued or delivered in New York, the "the common-law no-prejudice rule should apply." See Indian Harbor Ins. Co. v. City of San Diego, 586 F. App'x 726, 729 (2d Cir. 2014) ("If the New York legislature had intended to change the common law for all policies, it could have done so. We have previously declined to apply § 3420 outside the geographic scope dictated by the statutory language."). Here, neither party contends the policy was issued or delivered in New York and the common law no-prejudice rule would apply.

24-12 at 6). After a request for reconsideration, defendant affirmed its denial on the same grounds and added an additional grounds, that "[t]o the extent that there was a claim made that obligated the Insured to perform such actions, the Policy's notice provisions require the claim to be submitted no later than seven (7) days after receipt of the Governmental Order." (DE 24-14 at 6). Defendant adequately explained its denial of coverage and tied it to specific policy provisions. It did not first grant coverage, then subsequently deny it without explanation like in DENC. 32 F.4th at 50.

Defendant denying coverage for failure to give notice is not inconsistent with the first denial and does not concede plaintiff received a governmental order, as plaintiff argues. Defendant's letter states "[t]o the extent that there was a claim made that obligated plaintiff to perform such actions." (DE 24-14 at 6). By using the language "to the extent . . ." defendant is not conceding plaintiff received a governmental order. Therefore, this language is not inconsistent with the first denial or internally inconsistent with the second denial, which also relied on the lack of a governmental order. (See DE 24-14). Accordingly, plaintiff's waiver argument is without merit.

In sum, plaintiff failed to comply with the notice provision under the Policy, a condition precedent to coverage, and therefore its breach of contract claim fails as a matter of law.

2. UDTPA claim

A UDTPA claim requires "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff[]." Gray v. N. Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000). N.C. Gen. Stat. § 58-63-15 enumerates certain conduct as "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." "Conduct that violates § 58-63-15(11) constitutes a violation of [the UDTPA] as a matter of law." DENC, 32 F.4th at 50.

Plaintiff brings its UDTPA claim on the basis of the following statutory provisions of N.C.

Gen. Stat. § 58-63-15(11):

> Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; . . .
>
> Refusing to pay claims without conducting a reasonable investigation based upon all available information; . . .
>
> Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
>
> Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured; . . . and
>
> Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C. Gen. Stat. § 58-63-15(11)(b), (d), (f), (g), and (n).

a. Promptness

Neither the Supreme Court of North Carolina nor the Fourth Circuit, have analyzed subparagraph (b) of section 58-63-15(11) in detail. However, in the absence of such authority, the court relies on the plain language of the statute and the analyses of the provision by its sister courts in the circuit and the North Carolina Court of Appeals.

Courts in the state have not drawn a bright line deadline as constituting "[f]ailing to acknowledge and act reasonably promptly upon communications" relating to a claim under an insurance policy. N.C. Gen. Stat. § 58-63-15(11)(b). This court, for example, previously has held that a delay in communication of "54 days is not enough, by itself, to show an unfair settlement practice." First Protective Ins. Co. v. Rike, 516 F. Supp. 3d 513, 533-34 (E.D.N.C. 2021). Instead, courts have looked to whether an insurance company's "responses were reasonably prompt under the circumstances." Federated Mut. Ins. Co. v. Williams Trull Co., 838 F. Supp. 2d 370, 423

14

(M.D.N.C. 2011); see, e.g., Guessford v. Penn. Nat. Mut. Cas. Ins. Co., 918 F. Supp. 2d 453, 465 (M.D.N.C. 2013) (finding a plausible UDTPA claim where the "[d]efendant failed to respond to multiple communications and requests for settlement offers."); Meadlock v. Am. Fam. Life Assur. Co., No. COA11-1009, 2012 WL 2891079, at *7 (N.C. Ct. App. July 17, 2012) (reasoning that a four-month delay in communication, in and of itself, was not unreasonable and that further evidence was needed to determine whether that delay was reasonable or not).

The record reflects that defendant's responses in this case reasonably were prompt under the circumstances.  After plaintiff's initial claim December 8, 2021, defendant acknowledged receipt the next day.  (DE 24-7 at 6).  After investigating the claim, defendant provided an initial denial letter January 26, 2022.  (DE 24-12).  Defendant agreed to reconsider its coverage decision February 23, 2022, and issued its second denial letter April 6, 2022.  (DE 24-13 at 5, DE 24-14).  Once again, defendant reviewed and affirmed its decision in May 2022.  (DE 24-15 at 1).  Defendant also reviewed its coverage after plaintiff's complaint to the North Carolina Department of Insurance.  (DE 24-16).

Plaintiff's counsel then sent a letter June 5, 2023, asking defendant to reconsider its denial of the claim.  (DE 27-5 at 1-6).  Defendant responded June 28, 2023, stating, in relevant part: "Your June 5 letter indicates that the NCDEQ ordered G. Tyson Hopkins Associates, LLC to assess and clean up the site. However, to date we have only been provided with the NCDEQ letter issued to A & J Fuel Dock, LLC. Has there been any correspondence from NCDEQ to Hopkins about the site? If so, could you please send us copies?"  (DE 27-6 at 1).

On July 10, 2023, plaintiff provided defendant with copies of HES documents and invoices paid by plaintiff.  (DE 27-9 at 3-4).  Plaintiff's counsel then followed up with defendant after not

receiving a response on July 26, 2023. (DE 27-7). Plaintiff's counsel also sent defendant a letter via overnight mail September 1, 2023, requesting an update. (DE 27-8).

Defendant responded November 9, 2023, stating defendant "requested information about the claim that is needed for our evaluation, including an update on the site and any correspondence from the [NCDEQ] to G. Tysons Hopkins." (DE 27-9 at 1). "You subsequently provided a report and invoices from HES addressing work being done at the site, but we never received any response to our request for correspondence from NCDEQ." (Id.). Defendant continued: "Can you please confirm whether any such correspondence from NCDEQ exists? Please also send us copies of any such correspondence so that we can complete our evaluation." (Id.).

In response, plaintiff provided additional HES invoices and the NCDEQ's notices directed to Schroeder and A&J, stating "[t]he addressee was a mistake by NCDEQ as Aquaholics was just one of the tenants at the marina and they were not the operator of the fuel dock." (DE 27-10 at 18).

After not receiving a response, plaintiff followed up with defendant on December 2, 2023. (DE 27-11 at 1). Defendant did not respond to that inquiry, and plaintiff then filed suit May 22, 2024. (Gerard Hopkins Aff. (DE 27) ¶ 19).

Thus, in 2022 defendant acted promptly upon plaintiff's communications and conducted four separate reviews and determinations, all affirming its denial of coverage and providing the reasoning and policy provisions that formed the basis for the denial. (See, e.g., DE 24-12). All of these "responses were reasonably prompt under the circumstances." Federated Mut. Ins., 838 F. Supp. 2d at 423.

In support of its claim, plaintiff points to gaps in communications after plaintiff's June 5, 2023 letter. (DE 27-5). However, the factual record does not establish an unfair or deceptive trade

16

practice. The record shows defendant requested additional documents needed to reevaluate plaintiff's claim, and plaintiff failed to provide this information.

Plaintiff's June 5, 2023, letter stated the "NCDEQ [] made it crystal clear that it was ordering and directing plaintiff to assess and cleanup the petroleum release." (DE 27-5 at 2). Defendant's response stated it "is continuing to investigate your request set forth in your June 5, 2023 letter that we reconsider our coverage declination for this claim." (DE 27-6 at 1). Defendant then requested correspondence between plaintiff and the NCDEQ. (Id.).

In response, plaintiff did not acknowledge this request, and only provided documents and invoices from HES, not any correspondence from the NCDEQ as defendant requested. (See DE 27-9 at 3-4). Defendant's response November 9, 2023, also requested correspondence from the NCDEQ to plaintiff, stating "we never received any response to our request for correspondence from NCDEQ" and "[c]an you please confirm whether any such correspondence from NCDEQ exists?" (DE 27-9 at 1). Defendant stated this correspondence "is needed for our evaluation" and "send us copies of any such correspondence so that we can complete our evaluation." (Id.).

Plaintiff provided additional HES invoices and the NCDEQ's notices directed to Schroeder and A&J, stating "[t]he addressee was a mistake by NCDEQ as Aquaholics was just one of the tenants at the marina and they were not the operator of the fuel dock." (DE 27-10 at 18). The record again shows that plaintiff did not provide to defendant's requested information, nor confirm or deny that the correspondence from the NCDEQ to plaintiff existed, which plaintiff's letter did in fact indicate existed. (See DE 27-5 at 2). Moreover, defendant's June 28, 2023 response told plaintiff that defendant already had the notice directed at A&J in its possession. (DE 27-6 at 1).

In sum, defendant conducted four evaluations of plaintiff's claims in 2022. Additionally, plaintiff's exhibits show defendant requested additional documents that it needed to reevaluate the

17

claim, plaintiff failed to provide the documents and did not explain its failure. While defendant did take months to respond at times, without more, that does not provide sufficient evidence establish a valid UDTPA claim.

In <u>Guessford</u>, by contrast, the plaintiff stated a plausible UDTPA claim by alleging the defendant ignored multiple communications and settlement requests over seven months before replying that "it would not consider evaluating [p]laintiff's claim until [p]laintiff reached maximum medical improvement." 918 F. Supp. 2d at 465. In the instant case, gaps in communications and responses occurred after defendant already reviewed and affirmed its coverage decision four times, and after plaintiff did not provide the documents requested by defendant, correspondence which plaintiff indicated it had.

Viewing the record in the light most favorable to plaintiff, defendant did not act so unreasonably in its delays in acting and responding to show conduct that is "inherently unfair, unscrupulous, immoral, and injurious." <u>Elliott v. Am. States Ins. Co.</u>, 883 F.3d 384, 396 (4th Cir. 2018). Therefore, plaintiff's claim under N.C. Gen. Stat. § 58-63-15(11)(b) fails as a matter of law.

In arguing in support of its claim, plaintiff mischaracterizes in its brief the evidentiary record and exhibits it relies on. For example, plaintiff states on "June 28, 2023, defendant agree[d] to reconsider the denial and requests documentation." (Pl's Br. (DE 29) at 16). However, defendant on that date actually stated it was "continuing to investigate your request set forth in your June 5, 2023 letter that we reconsider our coverage declination for this claim." (DE 27-6 at 1). Defendant also requested at that time "any correspondence from NCDEQ to Hopkins about the site." (<u>Id.</u>).

Plaintiff also misstates in its brief that "July 10, 2023, the requested documentation is provided by plaintiff." (Pl's Br. (DE 29) at 16). However, in the July 10, 2023 email defendant relies on, plaintiff's counsel provides a series of documents from HES, and did not include any correspondence from the NCDEQ. (DE 27-7 at 2). As discussed above, defendant's June 28, 2023, email specifically requested correspondence between plaintiff and the NCDEQ. Accordingly, plaintiff's assertion in its brief that it provided the requested documentation is not supported by the factual record.

Plaintiff further asserts in its brief that "November 13 and 14, 2023, the requested new documentation is provided by plaintiff." (Pl's Br. (DE 29) at 16). However, plaintiff provided HES invoices and the notices from the NCDEQ directed at A&J. (See DE 27-10 at 18). As previously discussed, both defendant's June 28, 2023, email, and defendant's November 9, 2023 email specifically requested correspondence between plaintiff and the NCDEQ, not the correspondence from the NCDEQ directed at A&J, and defendant stated such correspondence "is needed for our evaluation." (DE 27-6, DE 27-9). Thus, plaintiff did not provide requested documentation to defendant.

In sum, the record shows delays in responses to plaintiff's correspondence beginning in June 2023; defendant did not respond to plaintiff's July 10, 2023 email until November 10, 2023. (See DE 27-6). Defendant also did not respond to plaintiff's email dated December 2, 2023 (DE 27-11 at 1).

However, plaintiff also portrays a narrative of events unsupported by the record. Defendant requested documentation to reconsider a coverage denial and stated it "is needed for our evaluation." (DE 27-9 at 1). Plaintiff contends in its brief that it provided all documents and was

"never told that any additional information was needed." (Pl's Br. (DE 29) at 16). This contention is contradicted by the record.

Moreover, plaintiff also disregards in its argument over a year of communications prior to these instances in 2023. In 2022, defendant provided plaintiff with four coverage evaluations and denied coverage each time. Then, in plaintiff's communications in 2023, plaintiff fails to provide or respond to defendant's request for additional information. Without plaintiff's embellishing of the factual record, plaintiff only shows delays in responding to communications, which, under the totality of the circumstances in the record, is not enough to show a UDTPA violation.

Accordingly, the evidence in this case, even viewed in the light most favorable to plaintiff, is insufficient to establish that defendant failed to act reasonably promptly to the level of an unfair and deceptive trade practice. Plaintiff's claim therefore fails as a matter of law.

> b. Investigation

N.C. Gen. Stat. § 58-63-15(11)(d) prohibits "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information[.]"

As discussed in the previous section, defendant reevaluated and investigated plaintiff's claim multiple times. (See, e.g., DE 24-12, DE 24-14). Plaintiff argues "[d]efendant was promptly provided everything requested and had pledged to investigate its denial of the Claim but evidently conducted no investigation." (Pl's Br. (DE 29) at 16). Again, however, plaintiff mischaracterizes the communications in the record. Contrary to plaintiff's assertions in its brief, plaintiff did not send all the requested documentation, and defendant's June 28, 2023 email did not pledge to reconsider the denial. (DE 27-6 at 1, DE 27-7 at 2).

The factual record thus shows no genuine dispute of material fact, and the evidence shows defendant conducted multiple investigations. Accordingly, plaintiff's claim fails as a matter of law.

c.    Good Faith

"[A] bad faith refusal to settle a claim cannot rest merely on honest disagreement or innocent mistake." ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. Of Pittsburgh, 472 F.3d 99, 125 (4th Cir. 2006). Accordingly, where an insurer "ha[s] reasonable bases to challenge the validity of [the insured's] claim," subparagraph (f) of § 58-63-15(11) is not applicable. Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd., 11 F. App'x 225, 234 (4th Cir. 2001).

Here, defendant provided a reasonable basis to challenge the validity of plaintiff's claims, where plaintiff reported the claim outside the required notice period. (See DE 24-7). In addition, although not resolved as a basis for judgment herein, defendant's alternative basis for denying coverage, based upon the governmental order naming a party other than the insured as a responsible party, also is a reasonable basis to challenge the validity of plaintiff's claims. (See, e.g., DE 27-6 at 1). Accordingly, plaintiff cannot succeed on its §58-63-15(11)(f) claim.

d.    Compelling Litigation

"Section 58-63-15(11)(g) prohibits '[c]ompelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured . . .'" Elliott, 883 F.3d at 398 (emphasis original). In Elliott, the court "conclude[d] that [the plaintiff] did not plausibly state a claim upon which relief can be granted based on this subsection because no amount was due to [the plaintiff] until liability had been determined." Id.

21

Here, as well, no liability has been determined under the policy. Therefore, plaintiff's claim under Section 58-63-15(11)(g) fails as a matter of law.

e.  Explanation

Section 58-63-15(11)(n) prohibits "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

Defendant provided plaintiff with multiple determinations and coverage letters, which cited to the specific policy provisions, facts and reasons why defendant denied coverage in relation to the facts. (See DE 24-12, DE 24-14).

Plaintiff argues "defendant committed in June 2023 to reconsider the Claim denial and in the 11-month period before this action was filed, they failed to provide any explanation as to what their analysis might be." (Pl's Opp. Br. (DE 35) at 13). As noted above, plaintiff's characterization of defendant's June 2023 email is inaccurate. (See DE 27-6 at 1).

Accordingly, plaintiff's section 58-63-15(11)(n) claim fails as a matter of law.

3.  Bad faith

"To establish a claim for bad faith refusal to settle, [plaintiff] must show: (1) a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct." Topsail Reef Homeowners, 11 F. App'x at 237 (4th Cir. 2001). "Bad faith means 'not based on honest disagreement or innocent mistake.'" Id. at 239. "Aggravated conduct is defined to include fraud, malice, gross negligence, insult ... willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." Id.

"[W]hen an insurer denies a claim because of a legitimate, 'honest disagreement' as to the validity of the claim, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith or any tortious conduct on the part of the insurer." Id.

Just as with plaintiff's Section 58-63-15(11)(f) claim, defendant here provided legitimate grounds for disagreement with the validity of the claim. Therefore, defendant is entitled to summary judgment on plaintiff's bad faith claim.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 25) is DENIED. Defendant's motion for summary judgment (DE 21) is GRANTED. Defendant is entitled to judgment in its favor on all claims. The clerk is DIRECTED to close this case.

SO ORDERED, this the 5th day of March, 2026.

_____
LOUISE W. FLANAGAN
United States District Judge

23